# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILIP EDWARD PALMER, JR.,**<br>Plaintiff,<br><br>v.<br><br>**CAROLYN W. COLVIN,**<br>**ACTING COMMISSIONER**<br>**OF SOCIAL SECURITY,**<br>Defendant. | )<br>)<br>)<br>) 1:14-0311-TFM<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION</u>

September 10, 2015

### I. Introduction

Philip Edward Palmer, Jr., ("Plaintiff") brought this action for judicial review of the decision of the Acting Commissioner of Social Security, which denied his application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383. The parties have filed cross-motions for summary judgment, ECF Nos. 8, 10, which have been fully briefed, ECF Nos. 9, 11, and are ripe for disposition. For the reasons that follow, the Acting Commissioner's motion will be **GRANTED**, and Plaintiff's motion will be **DENIED**.

### II. Background

Plaintiff was born on June 16, 1973. He has a limited educational background, having left school in the seventh grade, and has past relevant work experience as a lawn-care worker, fast-food worker, auto-body technician, and construction contractor. However, he has not engaged in substantial gainful activity since May 16, 2011, the date on which he filed his application for

1

SSI.[1] He alleges disability as of July 15, 2009, due to nerve damage in his back and neck, drop foot,[2] herniated discs, degenerative disc disease, and bulging discs.[3]

### A. Medical Evidence

#### 1. Meadville Medical Center

Plaintiff went to the emergency room on May 19, 2010, complaining of neck pain. (R. 326). The pain was noted to be "similar to prior episodes." (R. 326). It was further noted that Plaintiff had been to the ER on "multiple" prior occasions. (R. 327). He was discharged in good condition and instructed to wear a soft neck collar, limit his lifting, and rest until he felt better. (R. 327). He was also prescribed Vicodin and Flexeril, a muscle relaxant. (R. 327).

Plaintiff returned to the ER on August 5, 2010, again complaining of neck pain. (R. 330). It was noted that he "had similar symptoms many times previously." (R. 330). His physical examination was normal, except he displayed pain and muscle spasm in the neck upon movement, as well as a decreased range of motion and vertebral tenderness. (R. 330). Upon discharge, he was again given Vicodin and Flexeril and advised to follow-up with his primary care physician, Curtis Helgert, D.O.

Three months later, Plaintiff was back in the ER, this time with complaints of swelling in his right ankle. (R. 332). An x-ray showed normal alignment, with no evidence of fracture or bone lesion. (R. 332). The doctor noted that it did "not look like gout," and he also ruled out

---

1. Plaintiff's earning summary indicates that he continued to work in 2009 and 2010, although not at the level of substantial gainful activity. (R. 207).

2. "Foot drop, sometimes called drop foot, is a general term for difficulty lifting the front part of the foot. Foot drop isn't a disease. Rather, [it] is a sign of an underlying neurological, muscular or anatomical problem." Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/foot-drop/basics/definition/con-20032918 (last visited September 9, 2015).

3. Plaintiff has also been diagnosed with depression, but his appeal focuses on his physical impairments. Thus, only facts related to those impairments will be addressed.

deep vein thrombosis. (R. 333). Plaintiff was discharged in stable condition. (R. 333).

In early March 2011, Plaintiff went to the ER for moderate pain in his lower lumbar spine, right lower lumbar spine, right sacroiliac joint, and right gluteus. (R. 346). The doctor noted that Plaintiff had experienced prior back pain. (R. 346). Plaintiff reported that he had recently fallen, injuring his ankle and twisting his back. (R. 346). He also noted that he was out of pain medications from his PCP. (R. 346). A physical examination was normal, with the exception of moderate soft tissue tenderness in the right lower, left lower, and lower central lumbar area. (R. 346). Prior to being discharged, Plaintiff was diagnosed with acute lumbar strain and prescribed Vicodin. (R. 347).

A few weeks later, Plaintiff underwent an MRI of the lumbar spine, which showed multilevel degenerative changes. (R. 356). In particular, there was a minor concentral disc bulge at L3-4, but no significant neural foramina or central canal stenosis. (R. 356). There was a concentric disc bulge at L4-5. (R. 356). Minor broad-based posterior disc protrusion and some facet hypertrophic charges were noted, as well. (R. 356). Finally, at L5-S1, a focal tiny disc protrusion was seen in the left subarticular region. (R. 356). Some facet hypertrophic changes were also observed. (R. 356). However, there were no significant neural foramina or central canal stenosis. (R. 356).

In late May 2011, Plaintiff returned to the ER, still complaining of chronic pain in his lumbar region. (R. 348). He also reported that he had run out of pain medications. (R. 348). Upon examination, Plaintiff evinced pain in his neck with movement, vertebral tenderness, soft tissue tenderness, and a limited range of motion in his back, but he was otherwise normal. (R. 348). He was prescribed Vicodin and Flexeril and discharged in stable condition. (R. 349-50).

Plaintiff returned on June 1, 2011, explaining that he had "r[u]n out of Vicodin." (R.

427). He reported that Dr. Helgert had prescribed him 30 to 40 tablets per month, but "these just don't cut it." (R. 427). Upon examination, Plaintiff had moderate soft tissue tenderness in his lower central neck area and the mid-central lumbar area. (R. 427). He also had muscle spasms in the mid and lower central lumbar area. (R. 427). Prior to discharging him, the doctor advised Plaintiff that he needed to handle his pain medications through his PCP. (R. 427). Nevertheless, he was prescribed additional Vicodin, as well as Flexeril, and discharged in good condition. (R. 428).

Plaintiff went back to the ER twice at the end of the month, with complaints of left wrist pain, in addition to his usual back and neck pain. (R. 423, 425). At the time, he said that his back had been bothering him "since he pulled a motor out of a car." (R. 423). His pain was again treated with medications. However, during the second visit, the doctor "[a]gain discussed chronic pain management with" Plaintiff, who said that he was scheduled to see a pain management specialist and that his PCP had been unwilling to call in another prescription for pain medications for him. (R. 424). The doctor further advised Plaintiff that he would "not continue to manage" Plaintiff's "chronic condition." (R. 424). Plaintiff continued to undergo treatment at the ER throughout July and August 2011, sometimes on an almost daily basis. His pain continued to be treated with medications, including Flexeril and the non-narcotic pain reliever, Ultram. In late August 2011, it was noted that Plaintiff's pain had recently increased because he had been "walking around at the fair on uneven ground." (R. 417).

After a several month hiatus, Plaintiff returned to the ER for his back pain in late January 2012. (R. 397). Plaintiff had muscle spasms, severe soft tissue tenderness in the lower lumbar area, and mildly limited range of motion in the back (secondary to pain), but was otherwise normal. (R. 397). He was diagnosed with an acute lumbar strain and prescribed Vicodin. (R.

4

398).

On April 24, 2012, Plaintiff underwent an evaluation with Heath Fallin, M.D., a pain management specialist. (R. 450). Plaintiff noted that he had been experiencing pain "for the last 12 years or so." (R. 450). He believed that the pain resulted "from over use" because he previously worked in construction. (R. 450). At the time, Plaintiff was treating his pain with Norco. (R. 450). Even though it was prescribed as twice a day, he had been taking it three or four times per day. (R. 450). Plaintiff showed tenderness upon examination of his lumbar region. (R. 451). However, he could flex and extend, albeit with some pain. (R. 451). A straight leg-raising test and FABER test were both negative. (R. 451). An examination of the cervical spine also showed some tenderness, but Plaintiff displayed full range of motion and no weakness in the upper extremities. (R. 451). A Spurling's test was negative. (R. 451). Dr. Fallin also reviewed an MRI of Plaintiff's lumbar spine, which showed a minor broad based disc protrusion at L4-5, a disc bulge at L3-4, and hypertrophic changes at L4-5 with bilateral neuroforaminal encroachment. (R. 451). A cervical spine MRI was also reviewed, which showed a focal disc protrusion centrally at C4-5, mild right neuroforaminal encroachment at C5-6, facet hypertrophic changes, bilateral foraminal encroachment, central canal stenosis, and C6-7 posterior disc protrusion. (R. 451). Dr. Fallin diagnosed Plaintiff with degenerative disc disease of the lumbar spine and cervical spine with radiculopathy and discussed Plaintiff's options with him, explaining that he would recommend trying epidural steroid injections. (R. 452). However, Dr. Fallin noted that he would not prescribe Plaintiff pain medications until he reviewed the results of Plaintiff's drug screen. (R. 452). Plaintiff admitted that there would be Vicodin and Percocet in his urine, which he had gotten "off of his friend" the day before his appointment. (R. 452). Plaintiff was discharged from Dr. Fallin's care in early May, after he failed the

aforementioned drug test. (R. 383).

On June 11, 2012, Plaintiff reported to the ER once again for his chronic pain. (R. 446). It was noted that his PCP recently told him that "they would no longer supply him with pain killers" because traces of marijuana had been found in his urine. (R. 446). Upon examination, Plaintiff displayed a normal range of motion in his neck, while there was soft tissue tenderness and moderate muscle spasm in the lower central lumbar area. (R. 446). Plaintiff was discharged in stable condition, with instructions to apply ice and to continue taking his medications, which at that time, included Flexeril and Ultram. (R. 447).

At the end of July 2012, Plaintiff was back in the ER, complaining of moderate, aching pain in his cervical spine and lower lumbar spine. (R. 442). He displayed some moderate tenderness in his neck and lower lumbar area, as well as a limited range of motion in his lumbar spine. (R. 442). He was discharged in stable condition and instructed to limit lifting and strenuous activity. (R. 443).

### 2. Orthopedic Associates of Meadville

Plaintiff saw James R. Macielak, M.D., an orthopedic surgeon, for a consultation on September 7, 2010. (R. 360-61). Plaintiff described constant pain in his lower back and neck, which he rated at six to eight on a ten-point scale. (R. 360). He also explained that he had been taking Vicodin, along with Flexeril, Robaxin, and Neurontin, as prescribed by Dr. Helgert, and had undergone physical therapy in the distant past, but to no avail. (R. 360). On examination of the cervical spine, Plaintiff displayed tenderness in his right shoulder, but he had a full range of motion in his neck. (R. 360). A Spurling's test was negative, and a neurological exam was normal. (R. 360). So, too, was Plaintiff's muscle strength. (R. 361). An examination of Plaintiff's lumbar spine showed some tenderness, but he could bend over without exacerbating his

symptoms. (R. 360). Moreover, he could extend his lumbar spine 20 degrees with some exacerbation of symptoms. (R. 360). A straight leg-raising test was negative, and he Plaintiff had no manual motor or sensory defects. (R. 360). He was diagnosed with chronic neck and back pain; a disc bulge at C3-4, C5-6, and C6-7; and a small herniated nucleus pulposus at L5-S1 and L3-4. (R. 360). Dr. Macielak prescribed physical therapy and instructed Plaintiff to continue seeing Dr. Helgert for his Vicodin. (R. 360).

Plaintiff returned to Dr. Macielak for a follow-up on April 27, 2011. (R. 361). Plaintiff reported that he had a sudden onset of left foot drop in February 2011, when he twisted his ankle. (R. 361). Plaintiff also reported increased back pain, which worsened with prolonged standing. (R. 361). Dr. Macielak noted that Plaintiff's conservative treatment had "consisted of medication, chiropractic care, PT and lumbar support." (R. 361). On examination, Plaintiff showed some tenderness and discomfort when extending his back, but he could bend over without pain. (R. 361). A straight leg-raising test was negative, and his range of motion was normal. (R. 361). Dr. Macielak ordered x-rays, which showed mild disc space narrowing at L4-5 and L5-S1, but no evidence of listhesis or instability. (R. 361). The results of a recent MRI were also reviewed. (R. 361). In addition, Dr. Macielak referred Plaintiff for nerve studies of his left foot and discussed the possibility of performing spinal surgery. (R. 361).

When Plaintiff returned to Dr. Macielak's office in May 2011, he had not yet undergone the nerve studies. (R. 396). He said that his insurance would not cover it and he had failed to fill out the paperwork needed to extend his benefits. (R. 396). Plaintiff also requested pain medications, but he was instructed to consult his PCP. (R. 396).

Eventually, Plaintiff did undergo the nerve studies. (R. 395). According to Dr. Macielak, the studies revealed a peroneal nerve injury (or foot drop), which Dr. Macielak made clear, was

unrelated to Plaintiff's back pain and from which Plaintiff should eventually recover. (R. 395). Plaintiff asked Dr. Macielak what could be done about his back, and he was advised of different alternatives. (R. 395). Eventually, they decided to try epidural injections. (R. 395).

### 3. Primary Care Support Services

Plaintiff has treated with his PCP, Dr. Helgert, since 2008. (R. 391). On June 2, 2011, Plaintiff visited Dr. Helgert's office, "wanting something for his ongoing chronic pain." (R. 388). Plaintiff reported that "Vicodin isn't working anymore which of course is standard," Dr. Helgert noted. (R. 388). Plaintiff explained that "he was down to the turning point to detox and got detoxed acutely over a period of 3-4 days but then started having increasing back pain so he went back to taking narcotics." (R. 388). Following a discussion about Plaintiff's pain medications, Dr. Helgert noted that Plaintiff was "not inclined to deal with his back pain and he wants something for it." (R. 388). But Dr. Helgert was unwilling to continue prescribing him Vicodin. (R. 388). Instead, he started him on a trial of MS Contin. (R. 388).

Plaintiff followed up on June 16, 2011, at which time he reported that the MS Contin was "completely ineffective." (R. 388). Aside from the symptoms of his left foot drop, Plaintiff's exam was "otherwise essentially unrevealing." (R. 388). Plaintiff was encouraged to continue seeing his orthopedist and was given 40 Vicodin pills. (R. 388).

When Dr. Helgert next saw Plaintiff in July 2011, he asked for "something other than Vicodin." (R. 388). An examination showed "reasonable range of motion" and some tenderness in Plaintiff's neck and lower back. (R. 388). Plaintiff was prescribed OxyContin and referred to the pain clinic to discuss epidural injections. (R. 388).

Early the next month, Plaintiff followed up and expressed "some interest in detoxification." (R. 387). Ultimately, he was put back on MS Contin to "get him by until he sees

the pain clinic." (R. 387). Dr. Helgert also discussed inpatient detox with Plaintiff, but Plaintiff was not interested. (R. 387).

On September 1, 2011, Plaintiff returned to Dr. Helgert's office requesting a new pain medication, and he was started on Opana. (R. 387). But just a week later, Plaintiff told Dr. Helgert that he could not tolerate Opana and requested something different – specifically, Hydrocodone. (R. 386). Dr. Helgert noted that Plaintiff had missed a pain clinic appointment and not followed up afterward. (R. 386). Indeed, according to Dr. Helgert, Plaintiff "in general [was] not being very proactive in any way with regard to solving his problems with his neck and back pain." (R. 386). At the end of the visit, Dr. Helgert said that he would consider prescribing a different long-acting narcotic for Plaintiff if he brought back his Opana, but he was unwilling to prescribe him Vicodin again. (R. 386).

Later in the month, Plaintiff once again returned to Dr. Helgert's office to refill his pain medications. (R. 386). His physical findings remained unchanged, though he continued to have pain in his back. (R. 386). Plaintiff was prescribed Norco "with no refills" and advised to check back in a month. (R. 386). When he did so at the end of October, he was "doing OK." (R. 386).

On December 19, 2011, Dr. Helgert diagnosed Plaintiff with depression, and he reported that he was feeling irritable, agitated, and anxious. (R. 385). He was prescribed Celexa. (R. 385).

One month later, Plaintiff reported that Celexa had helped with his mood and made him less irritable. (R. 385). He continued to report pain in his back and neck, but his examination remained largely unchanged. (R. 385).

The next month, Plaintiff returned to refill his pain medications and reported increased pain in his neck and arm. (R. 384). "All in all," Dr. Helgert noted, "it is kind of an issue of terrible pain and he tends to believe there is something significantly wrong with it in spite of

9

having fairly extensive work-up." (R. 384). Plaintiff was prescribed Vicodin. (R. 384).

In late April, Plaintiff told Dr. Helgert that he longer wanted to take Vicodin because it did not "work all that well." (R. 383). He wanted to take morphine instead, but Dr. Helgert "didn't see the point to represcribe that." (R. 383). Instead, he prescribed OxyContin. (R. 383). Following this appointment, Dr. Helgert completed a "Physician's Information Request" for the Domestic Relations Section of the Court of Common Pleas of Crawford County, opining that Plaintiff's "likelihood of resuming work within [the] next 6 months is unlikely" due to his chronic back pain. (R. 391).

In early June, Plaintiff called Dr. Helgert's office requesting pain medications, but Dr. Helgert "once again told him that he will not give him pain meds." (R. 382). Two weeks later, Plaintiff visited Dr. Helgert's office, again requesting pain medications. (R. 382). But Dr. Helgert reiterated that he was unwilling "to prescribe any significant narcotic type pain medications." (R. 382). Instead, he prescribed Ultram. (R. 382). The following week, Plaintiff presented for a re-check of his medications. (R. 382). He reported that Ultram gave "him a bit of a headache," but otherwise, he was "doing OK." (R. 382).

Plaintiff returned to Dr. Helgert's office on October 29, 2012, to refill his medications. (R. 381). He also wanted "some pain pills" and requested a referral to "get his back fixed." (R. 381). Dr. Helgert "reviewed with [Plaintiff] once again that he has been discharged from several pain clinics due to dirty urines" and "sent . . . to a multitude of orthopedists and other specialists who he really does not follow up with . . . ." (R. 381). "Once again," Dr. Helgert "reiterated to [Plaintiff] that [he was] not willing to manage his back issues for him." (R. 381). Dr. Helgert nevertheless refilled Plaintiff's medications and told him that if he found a new doctor who would treat his back pain he would, "as a courtesy, make a referral for him." (R. 381). Following

this appointment, Dr. Helgert completed another "Physician's Information Request" for the Domestic Relations Section, in which he indicated, without any explanation, that Plaintiff would be "continuously disabled (unable to work)" through April 30, 2013. (R. 390). In an undated letter, also presumably sometime after this appointment, Dr. Helgert advised Plaintiff that he would no "longer provide pain management services, such as prescriptions and referrals" to him because of his "failure to keep or follow up with referrals" and his "recent dismissal from Dr. Fallin due to a failed urine drug screen . . . ." (R. 389).

### B. Procedural History

Plaintiff's claims were denied at the state-agency level, and thereafter, he requested a hearing, which was held on March 28, 2013, before Administrative Law Judge ("ALJ") John Kooser. Plaintiff was represented by counsel and testified at the hearing, as did an impartial vocational expert ("VE"). On May 28, 2013, the ALJ issued a decision, in which he denied Plaintiff's application for benefits. The ALJ determined that Plaintiff could perform light work[4] with a sit/stand option and a number of additional postural, environmental, and mental limitations. (R. 25). Based on the VE's testimony that there are a significant number of jobs in the national economy that someone such as Plaintiff could perform, the ALJ held that he is not disabled under the Act. The ALJ's decision became final when the Appeals Council denied Plaintiff's request for review on October 17, 2014. (R. 1-6). This action followed.

---

4. Light work is defined in the regulations as follows:

   Light work involves lifting not more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

### III. Legal Analysis

#### A. Standard of Review

The Act strictly limits the Court's ability to review the Commissioner's final decision. 42 U.S.C. § 405(g). "This Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, the Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

#### B. Discussion

Plaintiff argues that the ALJ erred in declining to afford controlling weight to the March 7, 2013, opinion of his PCP, Dr. Helgert, regarding the number of days Plaintiff would call off work and be unable to complete during a work day because of his impairments. A treating physician's opinion is generally entitled to more deference than that of a non-treating source. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted). When deciding how much weight to afford a treating physician's opinion, an ALJ must follow the procedure set forth

in the regulations. 20 C.F.R. § 404.1527(c)(2). The ALJ must first consider whether the treating physician's opinion is entitled to "controlling weight." SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). A treating physician's opinion must be given "controlling weight" if it is founded upon "medically acceptable, clinical, and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] record[.]" 20 C.F.R. § 404.1527(c)(2). If the ALJ finds that a treating physician's opinion is not entitled to "controlling weight," that does not, in and of itself, mean that the opinion "should be rejected." SSR 96-2p, 1996 WL 374188, at *4. Rather, it is "still entitled to deference and must be weighed" in accordance with the factors in 20 CFR 404.1527(c). SSR 96-2p, 1996 WL 374188, at *4. Those factors include (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record, (5) the doctor's specialization, and (6) any other factors that "tend to support or contradict the opinion."[5] 20 C.F.R. § 1527(c)(1)-(6). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.*

"In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports . . . ." *Morales*, 225 F.3d at 317 (citations and quotation marks omitted). Instead, an ALJ "may reject a treating physician's opinion outright only on the basis of contradictory medical evidence . . . ." *Id.* An ALJ may, however, "afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)). Furthermore, when an ALJ rejects a treating physician's opinion, he or

---

5. Although these factors must be considered, an ALJ need not "apply *expressl*y each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (emphasis added).

she must "always give good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2). The ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *5.

The record contains two forms completed by Dr. Helgert. In a medical source statement dated June 16, 2011, Dr. Helgert opined that Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally; stand for four hours during a work day; sit for eight hours during a work day with a sit/stand option; and occasionally engage in all postural activities. (R. 370-71). According to Dr. Helgert, Plaintiff required no further physical or environmental restrictions. (R. 371). In a questionnaire accompanying this form, Dr. Helgert indicated that Plaintiff had full range of motion in his dorso lumbar and cervical regions; no ankylosis of the spine; no arachnoiditis; and no pseudoclaudication. (R. 365). In the second medical source statement, completed at the behest of Plaintiff's counsel on March 7, 2013, Dr. Helgert largely reiterated his prior opinions. (R. 391-94). In particular, he opined that Plaintiff could lift/carry 20 pounds frequently and 50 pounds occasionally; stand/walk for five hours during a work day; and occasionally engage in all postural activities except climbing. (R. 392). He also noted that Plaintiff had no manipulative limitations and would require a sit/stand option. (R. 393). Furthermore, he opined that Plaintiff could not work around dust or in extremely cold temperatures. (R. 394). At the end of the form, Dr. Helgert was asked how often Plaintiff was likely to call off work due to his impairment, and he answered two days. (R. 394). Next, he was asked how often Plaintiff would be medically unable to complete a full work day due to his impairment, and he answered three days. (R. 394). In response to the final question, however, he indicated that Plaintiff would not require any unscheduled breaks in excess of 10 to 15 minutes

14

during a work day. (R. 394).

The ALJ considered both of these forms in determining Plaintiff's residual functional capacity ("RFC"), and he largely adopted their findings. "The earlier one," he wrote, "is not indicative of disability, is not appreciably different than the residual functional capacity assessment adopted in this decision, and is accepted." (R. 27). However, the ALJ found that Dr. Helgert's opinion that Plaintiff "would likely miss work two days every five day work week, and that he would be unable to complete a full work day three days . . . cannot be fully credited, as it is not supported by the evidence of record as a whole, including the objective clinical findings, and the authoring doctor's own treatment notes." (R. 27).

Substantial evidence supports the ALJ's decision. First of all, Plaintiff's physical and mental examinations were routinely unremarkable, and, as the ALJ found, x-rays MRIs showed, at most, minor degenerative changes and other relatively insignificant findings.[6] (R. 26, 27). Besides Plaintiff's subjective complaints, which the ALJ properly assessed and found not fully credible, there was no evidence in the record to suggest that Plaintiff would call off or be unable to complete a work day as frequently as Dr. Helgert opined he would. That is not to say that Plaintiff did not suffer from real impairments. However, the ALJ properly accounted for them by limiting him to light work with a sit/stand option and adding additional physical, environmental, and mental restrictions. The record evidence did not compel the ALJ to recognize any further limitations.

The ALJ was also correct that Dr. Helgert's own treatment notes failed to bolster his opinions regarding Plaintiff's probable absenteeism. *See Acevedo v. Colvin*, No. CIV.A. 13-

---

6. The only piece of evidence that Plaintiff points to in support Dr. Helgert's opinion is the MRI referenced in the April 24, 2012, note from the pain management center. Pl.'s Br. at 13, ECF No. 11. The results of this MRI, however, do not actually support Dr. Helgert's finding since they showed, at most, minor degenerative changes. (R. 465).

2050, 2013 WL 6667797, at *4 (E.D. Pa. Dec. 18, 2013) ("An ALJ's decision to reject the opinion of a treating physician is proper where the physician's own treatment records do not support his/her opinion . . . ."). Although Dr. Helgert prescribed Plaintiff with narcotic pain medications and other forms of treatment for his neck and lower back pain, he routinely documented normal physical findings and reported, at times, that Plaintiff's condition was "OK." (R. 382, 386). And over time, he clearly became concerned that Plaintiff was misusing his medications and failing to follow up with referrals – so much so that he became unwilling to manage Plaintiff's chronic pain issues for him. (R. 389). Dr. Helgert's sparse notes contain reflections and asides on Plaintiff's possible drug-seeking behavior, but little in the way of objective medical findings that would suggest that Plaintiff's impairments would cause him to frequently call off or be unable to complete a workday. Nor did they suggest that Plaintiff was in such great pain that his impairments would totally preclude him from working.

In addition, as the ALJ observed, Dr. Helgert's earlier medical source statement did not suggest that Plaintiff was disabled. Rather, it was consistent with the ALJ's ultimate conclusion that Plaintiff could perform a range of light work. The ALJ properly relied on this opinion insofar as it was consistent with the bulk of the medical evidence. So, too, was the opinion of the state agency physician, Nghia Van Tran, M.D., which the ALJ also properly considered and ascribed great weight, as he was entitled to do. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records . . . [s]tate agent opinions merit significant consideration as well.") (citations omitted).

Plaintiff argues that these earlier opinions do not necessarily contradict Dr. Helgert's later conclusions about the amount of work days Plaintiff would call off or be unable to complete.

16

Pl.'s Br. at 13, ECF No. 11. "It is inevitable that the opinions of Dr. Helgert from 2011 to 2013 would have differences," he contends, "given that time span and the ever changing nature of one's medical conditions." *Id.* True enough. One could reasonably expect that a medical condition might worsen over time, resulting in more significant work-related impairments. But Dr. Helgert's second medical source statement did not actually document a discernible decline in Plaintiff's condition over time. His two forms did not appreciably differ; both were, by and large, consistent with a finding that Plaintiff could perform light work with certain additional restrictions. The only difference was that, in 2013, Dr. Helgert opined – without citing any supporting evidence whatsoever – that Plaintiff would call off and/or be medically unable to complete a work day on a relatively frequent basis. For the reasons already discussed, the ALJ properly discounted this portion of the form. There is simply no evidence in the record to support Dr. Helgert's conclusion on this issue.

To be sure, the ALJ could have explained his analysis more clearly and thoroughly. But the Court is not "'in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" *Davis v. Astrue*, *Davis v. Astrue*, 830 F. Supp. 2d 31, 49 (W.D. Pa. 2011) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057)). The ALJ's explanation for the weight given to Dr. Helgert's opinions, though somewhat cursory, is nonetheless sufficient and is supported by substantial evidence in the record. Accordingly, the decision of the ALJ will be affirmed.

## IV.  Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that he faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the

reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Act.

For the reasons hereinabove stated, the Court will **GRANT** the Motion for Summary Judgment filed by the Acting Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff. An appropriate Order follows.

McVerry, S.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PHILIP EDWARD PALMER, JR., <br> Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, <br> ACTING COMMISSIONER <br> OF SOCIAL SECURITY, <br> Defendant. | ) <br> ) <br> ) <br> ) 1:14-0311-TFM <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## ORDER

**AND NOW**, this 10th day of September 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the Acting Commissioner's MOTION FOR SUMMARY JUDGMENT (ECF No. 8) is **GRANTED**, and Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 10) is **DENIED**.

The Clerk shall docket this case **CLOSED**.

BY THE COURT:

s/ Terrence F. McVerry
Senior United States District Judge

cc: **R. Christopher Brode, Esq.**
Email: brodelaw@hotmail.com

**Marshall J. Piccinini, Esq.**
Email: marshall.piccinini@usdoj.gov

(via CM/ECF)